**SCHULTZ & LINDSAY CONSTRUCTION COMPANY and Industrial Builders, Inc., Appellants,**

v.

**Bruce ERICKSON, for Himself and as Trustee for the North Dakota Workmen's Compensation Bureau, Appellee.**

No. 17957.

United States Court of Appeals Eighth Circuit.

Nov. 2, 1965.

Mart R. Vogel, of Wattam, Vogel, Vogel, Bright & Peterson, Fargo, N. D., for appellant. Schultz & Lindsay Construction Co.

O. C. Adamson, II, of Meagher, Geer, Markham, & Anderson, Minneapolis, Minn., made argument for appellant, Industrial Builders, Inc., and filed brief with F. J. Smith, of Fleck, Smith, Mather & Strutz, Bismarck, N. D.

Kelton S. Lynn, of Whiting, Lynn, Freiberg & Shultz, Rapid City, S. D., made argument for appellee and filed brief with William S. Murray, of Cox, Pearce, Engebretson, Murray & Anderson, Bismarck, N. D.

Before MATTHES, RIDGE and GIBSON, Circuit Judges.

MATTHES, Circuit Judge.

In this personal injury action the defendants below have appealed from the judgment, entered on a jury verdict, awarding plaintiff $95,000. Diversity of citizenship and the requisite amount in controversy establish jurisdiction.

The trial commenced on October 5, 1964, and the jury's verdict was returned on October 16, 1964. The record before us consists of 854 printed pages, in addition to which there are numerous exhibits. Notwithstanding this, there is remarkable unanimity among the parties as to the material facts.

Emmons County, North Dakota, employed Staven Engineering Company (Staven) to design and draw plans for a bridge across Big Beaver Creek, and to supervise its construction. Plaintiff, a graduate civil engineer, was an employee of Staven and was the project "inspector and engineer". The accident, out of which this litigation arose, occurred on October 1, 1962. At that time plaintiff was 23 years of age.

Schultz & Lindsay Construction Company (Schultz & Lindsay) was the general contractor hired by Emmons County for the construction of roads and bridges. Industrial Builders, Inc., (Industrial) was the subcontractor of Schultz & Lindsay for the construction of the bridge across Big Beaver Creek.[1]

A brief description of the bridge will aid comprehension of the issues before us. Its deck extends in a north-south direction and rests upon a north abutment, a north pier, a south pier, and a south abutment. The deck is supported by two large sectioned beams (the east interior beam and the west interior beam), each of which is 300 feet in length from abutment to abutment. Each beam is made up of five structural steel girders of the "I" beam form. The five girders are of unequal length; they are 36 inches in height and weigh 194 pounds per foot of length. Under the plans, the girders were to be held together, as they were being erected, by "erection bolts", i. e., the ends of the girders were to be bolted together by a metal plate and four bolts. This was to provide a temporary splice. The temporary splice was neces-

---

1. Hereinafter, we shall refer to Schultz & Lindsay and Industrial collectively as "appellants".

sary to enable the camber (curve) of the beam to be adjusted after all of the girders in each beam were in place, but before they were permanently fastened together. The plans then contemplated that the steel girders would be permanently fastened together, end to end, by a "welded" splice, i. e., the end of each girder would be welded to the end of the next girder.

The accident happened during the course of the erection of the steel beams. Appellee, who was supervising the erection and the splicing of the girders, was sitting on the portion of the east beam which had been erected when the temporary splice, joining the first two girders of the east beam, gave way. The girders and plaintiff fell to the ground. Plaintiff received serious and permanent injuries, reflected by the size of the judgment.

Appellee sued Schultz & Lindsay and Industrial. In his complaint, he alleged, in general terms, that both appellants were negligent in the construction of the bridge. However, appellee tried the case on the theory that Industrial, the subcontractor, was negligent in the erection of the steel girders, and that Schultz & Lindsay, the general contractor, was vicariously liable under the "inherent danger" doctrine.

Staven, Schultz & Lindsay, and Industrial were contributing employers to the North Dakota Workmen's Compensation fund. Appellee, as an employee of Staven, was paid compensation. Appellants contended below, and assert here, that they were statutory employers of appellee and, as such, were immune from liability for damages in this action. From this premise, appellants argue that the court erred in not granting their motion to dismiss, on the ground that appellee's action was barred by the North Dakota Workmen's Compensation Act. Two sections of that Act require consideration.

Section 65–01–08 of the North Dakota Century Code provides that, where an employer has secured the payment of compensation to his employees by contributing to the North Dakota Workmen's Compensation fund the employee shall have no right of action against the contributing employer, "but shall look solely to the fund for compensation". In order to correctly interpret and apply this provision, the word "employee" must be defined. Section 65–01–02, subd. 5(c) of the North Dakota Century Code provides:

"Persons employed by subcontractor, or by an independent contractor operating under an agreement with the general contractor, for the purpose of this chapter shall be deemed to be employees of the general contractor who shall be liable and responsible for the payments of premium for the coverage of these employees until the subcontractor or independent contractor has secured the necessary coverage and paid the premium therefor."

Statutes like 65–01–02 have been adopted in nearly all of the states. They are referred to as "statutory-employer" or "contractor-under" statutes. See Larson, The Law of Compensation, Vol. 2, § 72.31, p. 175. As Larson points out, such statutes provide that the general, or principal, contractor shall be liable for compensation to the employee of an uninsured subcontractor, doing work which is part of the business, trade or occupation of the principal contractor. Manifestly, this type of statutory provision is designed to afford protection for employees not otherwise protected by insurance, but, as Larson also observes:

"Since the general contractor is thereby, in effect, made the employer for the purpose of the compensation statute, it is obvious that he should enjoy the regular immunity of an employer from third-party suit when the facts are such that he could be made liable for compensation; and the great majority of cases have so held." Ibid.

Appellants argue that:

"[S]ince all the employers, Staven, Schultz & Lindsay and Industrial were operating as contractors under contract to a common employer, Emmons County, and since plaintiff was

employed by one of such contractors, he became a 'statutory employee' of Schultz & Lindsay, the general contractor which the County hired to carry out the entire job, operating under an agreement to work with Staven, plaintiff's employer."

■ This ingenious argument is neither supported by the facts nor by the cases of Schwarze v. Farm-Rite Implement Co., 192 F.Supp. 645 (D.N.D.1960), and Ryland v. The Manhattan Construction Co., unreported, (D.N.D.), upon which appellants place reliance. It is significant that the Schwarze and Ryland cases were decided by the Honorable George S. Register, the same judge who presided over this trial, and who, of course, ruled that appellee's cause of action was not barred by the statutes we have discussed.

Schwarze involved an action for damages by an employee against his employer (a subcontractor) and the general contractor. The latter had secured compensation coverage for its employees. Judge Register held that under the Act, particularly § 65–01–02, supra, the general contractor was immune from an action by the injured employee of the subcontractor.

The Ryland case was discussed by Judge Register in his Schwarze opinion. From that discussion, it appears that the question presented in Ryland was whether the general contractor was immune from suit brought by the survivor of an employee of the second subcontractor. The court held that the general contractor was a statutory employer of the injured employee, so was immune from the action.

We cannot agree with appellants' claim that the facts of the instant case fall within the rule of the Schwarze and Ry-

land cases. Here, unlike in Schwarze and Ryland, appellee was not an employee of a subcontractor. Neither was he an employee of the general contractor, Schultz & Lindsay. It should be noted again that an employee is defined to be a person "employed by subcontractor, or by an independent contractor *operating under an agreement with the general contractor,* * * * *". (Emphasis supplied). North Dakota Century Code, § 65–01–02, subd. 5(c). Even if we could characterize Staven as an independent contractor, appellants' position would still be untenable, because it is clear that Staven was not *"operating under an agreement"* with Schultz & Lindsay, but rather with Emmons County.

We are satisfied that Judge Register, who is eminently qualified to interpret North Dakota law, properly concluded that appellee was entitled to maintain this action under § 65–01–09 of the North Dakota Century Code.[2]

Appellants challenge the sufficiency of the evidence to make a submissible case and assign error for failure to grant their timely motions for directed verdict. They contend that the evidence reveals, as a matter of law, that there was no actionable negligence on the part of Industrial.

■ We recognize that, in this diversity case, since the accident occurred in North Dakota, the substantive law of that state is applicable.

■ However, we are confronted with the question, not raised by the parties, and never decided by the Supreme Court of the United States, Dick v. New York Life Ins. Co., 359 U.S. 437, 444–445, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959); Ozark Air Lines, Inc. v. Larimer, 352 F.2d 9 (8 Cir. Oct. 11, 1965); Lewis v. Nelson, 277 F.2d 207, 209 (8 Cir. 1960), whether

---

2. This statute provides that when an injury or death for which compensation is payable shall have been sustained under circumstances *creating in some person other than the fund* a legal liability to pay damages in respect thereto, the injured employee may claim compensation under the North Dakota Compensation Act and proceed at law to reco   damages against

such other person. The statute further provides that the fund shall be subrogated, pro tanto, to the extent of the amount of compensation paid to the injured employee. In this case, appellee was paid compensation benefits from the fund and, of course, the fund is entitled to recover the amount it has paid, from the proceeds of appellee's judgment.

the state or the federal test for the sufficiency of the evidence is applicable. The federal courts and the North Dakota courts apply substantially the same standard in determining the sufficiency of the evidence. (Coca Cola Bottling Co. v. Hubbard, 203 F.2d 859, 860–861 (8 Cir. 1953); Wray M. Scott Co. v. Daigle, 309 F.2d 105, 108–109 (8 Cir. 1962), setting forth the federal test; Grenz v. Werre, 129 N.W.2d 681, 685–686 (N.D.1964), setting forth the North Dakota test). Both parties assumed that North Dakota law was to be applied. Therefore, we shall follow the standard which the Supreme Court of North Dakota has enunciated in the following language:

"On a challenge to the sufficiency of the evidence to support the verdict this court will take the view of the evidence most favorable to the verdict, giving to plaintiff's evidence the strongest probative force of which it will admit and will draw therefrom such inferences and conclusions favorable to the jury's verdict as a reasonable consideration of the evidence will permit." (Citations of authority). Stadick v. Olson's Hardware, 64 N.W.2d 362, 364 (N.D.1954).

This rule was discussed by our court, Judge Johnsen, in the case of United States Fire Ins. Co. v. Milner Hotels, Inc., 253 F.2d 542, 546–547 (8 Cir. 1958). He stated:

"In relation to what has been said, it must conformingly be borne in mind that under North Dakota law, as generally, negligence and proximate cause are not ordinarily questions which may be taken from the jury. 'They become questions of law only when the state of the record is such that reasonable men can draw but one conclusion therefrom'. Froh v. Hein, 76 N.D. 701, 39 N.W.2d 11, 13; Geier v. Tjaden, N.D., 74 N.W. 2d 361, 364.

"Negligence and proximate cause will become transformed from questions of fact into questions of law rather on probative deficiency than on probative abundance. Thus, no matter how strong the evidence of a party, who has the burden of establishing negligence and proximate cause as facts, may comparatively seem to be, he is not entitled to have those facts declared to have reality as a matter of law, unless there is utterly no rational basis in the situation, testimonially, circumstantially, or inferentially, for a jury to believe otherwise. Nor is a court required to set aside a verdict in such a situation, just because the judgment of the jury may have been strange and unusual on the evidence in the case."

The federal standard for the sufficiency of *circumstantial* evidence (as set out in Wray M. Scott Co. v. Daigle, supra) is also basically the same as that adhered to by the North Dakota courts and discussed in Smith v. Knutson, 76 N.D. 375, 36 N.W.2d 323, 327 (1949):

" * * * 'The most direct and positive testimony may be completely demolished by circumstantial evidence, or overcome in the minds of a jury or the mind of a court by the establishment of other facts inconsistent therewith.' In Paulsen v. Modern Woodmen of America, 21 N.D. 235, 243, 130 N.W. 231, 234, this Court said:

" 'Ordinarily the question of what inferences are deducible from the evidence is peculiarly a question for the jury, and it is only in rare instances that the court is justified in determining such question as a matter of law. If it can be said that reasonable men may fairly differ as to the inferences to be deduced from all the circumstances disclosed, it is a proper case for the jury.' "

As we noted, supra, appellee's complaint alleged appellants' negligence in general terms. The issue was also submitted to the jury generally, rather than

in terms of specific acts. Under the court's instructions, the jury was authorized to return a verdict for appellee if it found that Industrial had been "negligent in one or more of the particulars alleged" and, that such negligence "was a proximate cause" of the injuries and consequent damages sustained by appellee. None of the parties took exception to the manner in which the court submitted the negligence issue to the jury.

As we read appellants' briefs, their position is: (a) that the temporary splice designed for the erection of the steel beams by Staven, appellee's employer, was wholly inadequate, unsafe and hazardous; (b) that Staven, as the design engineer, and appellee as the inspector-engineer, should have known of the inadequacy of the temporary splice; (c) that the unsafe method of construction was carried out under appellee's supervision; and (d) that the temporary splice, which joined the first two girders of the east beam, gave way solely because it was not adequate to support the weight of the two girders, not as the result of any negligence on the part of Industrial.

There was evidence tending to support appellants' theory, but the jury was not compelled to, and apparently did not, believe appellants' version of the cause of the accident. This is plausible since there are facts and circumstances which support appellee in his contention that the method chosen for the construction was not unsafe; that the temporary splice would not have broken except for an uncontemplated outside force set in motion by the negligent conduct of Industrial's employees. More particularly, appellee argues that there was probative evidence from which the jury was able to find that one of Industrial's crane operators moved either the boom or the cable of his crane in such a way as to cause the portion of the west beam that had been erected, to be moved abnormally, and that the movement was transferred to the east beam, via the dia-

phragm, causing the temporary splice to break and the east two girders to fall. Regarding this contention of negligence, appellants claim that there is "not a scintilla of evidence that the boom contacted the bridge in any way. It is a matter of pure and utter speculation."

We turn to the evidence relied upon by appellee to support this theory of actionable negligence.[3]

The first two girders, or segments, of the east beam had been placed on the north abutment and north pier. They had been joined together by the temporary splice, consisting of four erection bolts and a metal plate. This method appeared to be insufficient to hold the weight of the beams so, additionally, with appellee's approval, two steel rods were welded across the splice. This splice, without additional support, proved adequate and held for more than an hour and a half. After the lunch period, employees of Industrial placed the first two segments of the west beam on the north abutment and north pier (in a position corresponding to the segments of the east beam) and temporarily spliced them. Diaphragms (steel cross beams) were next placed between the east and west beam. Industrial's welder, Mr. Wieck, who had been working on bolting the third diaphragm in place, bolted the east end of the diaphragm to the east beam and began to walk across on the diaphragm to the west beam, where he was going to assist Mr. Bruesch in bolting the west end of the diaphragm to the west beam of the bridge. Although the diaphragm was "up tight against the west beam", Mr. Bruesch (also an Industrial employee) was having difficulty in bolting the diaphragm because the holes in the two pieces of steel were not properly aligned. As Mr. Wieck was crossing over the diaphragm, he saw Mr. Bruesch give the operator of the crane (an employee of Industrial), which was attached to the west beam, a signal, which Mr. Wieck

3. During the trial, appellee asserted, and attempted to prove, that Industrial was negligent in more than one particular. However, he has confined his claims here, primarily to the allegedly negligent conduct above mentioned.

interpreted to mean "boom down". At that time the boom of the crane was one and one-half to two feet from the west beam. Seconds later, with no prior warning, the splice joining the two girders of the east beam failed and the girders and appellee fell to the ground. There was also evidence that Mr. Breusch, who was standing on the east side of the west beam, with his feet on the bottom flange and his left arm holding onto the top of the west beam, sustained injury to his left arm and his right ribs. There was no equipment on or near the west beam, where Mr. Breusch was standing, except the crane and a drift punch, which had been inserted into a hole in the diaphragm and in the west beam. Mr. Breusch felt no motion when the east beam fell and, although his right leg was against the diaphragm, his right leg was not injured.

Based on this evidence, the jury was entitled to conclude that the temporary splice joining the two segments of the east beam was a proper and safe method of construction, and would have held if some other force had not intervened to cause the splice to give way. There was sufficient circumstantial evidence, as outlined above, to support the inferences: that there was an unusual movement of the boom or cable of the crane which caused the west beam to move; that the movement of the west beam subjected the splice in the east beam to an abnormal amount of stress; that the splice broke under the stress and; that Industrial was negligent in causing, or permitting, the unusual movement of the crane.

█ In summary, we are convinced that the evidence presented a question of fact which was properly submitted to the jury.

Appellants also assert that the court should have directed a verdict because:

"Plaintiff, as a matter of law, was guilty of contributory negligence and assumed the risk." Appellants do not favor us with any authority to support this contention. They merely rely upon the same facts and arguments which they used to demonstrate their freedom from negligence, and which, they say, "equally support the conclusion that, as a matter of law, plaintiff assumed the risk and, if defendant was negligent, plaintiff was more so."

█ North Dakota adheres to the rule, generally recognized throughout the United States, that the issue of contributory negligence is ordinarily one of fact for the jury, and it is only where the evidence is such that reasonable men can draw but one conclusion therefrom that it becomes a question of law for the court. Armstrong v. McDonald, 72 N.D. 28, 4 N.W. 2d 191, 192 (1942); Killmer v. Duchscherer, 72 N.W.2d 650, 655 (N.D.1955); Keller v. Elks Holding Co., 209 F.2d 901, 903 (8 Cir. 1954); Born v. Osendorf, 329 F.2d 669, 671 (8 Cir. 1964).

█ The North Dakota standard for determining whether or not a party has been guilty of such contributory negligence as will defeat his recovery is whether his activities were those of an ordinarily prudent person, in the same circumstances and in the same position. Umland v. Frendberg, 63 N.W.2d 295, 299 (N.D.1954); Olson v. Cass County Electric Co-operative, Inc., 94 N.W.2d 506, 511 (N.D.1959).

█ Applying this standard, we cannot hold that the state of the record is such that reasonable men could not differ on the issue. Indeed, inasmuch as the evidence supports a finding that the two segments of the east beam fell as the result of the active negligence of Industrial's crane operator, the contributory negligence argument pales into insignificance. Undoubtedly, appellee had the right to be in the position he was occupying when the girders separated and fell. There was no evidence that appellee, directly or indirectly, caused the movement of the boom or crane or that he, in any way, contributed to the breaking of the splice. If the evidence had established that the temporary splice gave way solely because of its inherent weakness and that appellee had actual or

constructive knowledge of this condition, appellants' contention would merit more consideration. But, on this record, we have no difficulty in concluding that there is no rational basis for holding that appellee's conduct constituted contributory negligence, as a matter of law.

Under the court's instructions, the jury was at liberty to determine that appellee had assumed the risk of the hazards involved in bridge construction, and to find against appellee on that ground.[4]

Obviously, the district court and all of the parties were of the view that the assumption of risk doctrine would be applied by the Supreme Court of North Dakota in this type of negligence case.[5]

■ An impartial appraisal of the record clearly demonstrates that there is no merit in the contention that appellee is barred from recovery, as a matter of law, on the theory that he assumed the risk. If the doctrine of assumption of risk is applicable to this case, there was sufficient evidence to require submission of the issue to the jury.

Appellants contend that the court committed prejudicial error in instructing the jury that there was an evidentiary presumption that appellee was exercising ordinary care for his own safety at the time of the accident.

It is undisputed that, at the time of the trial, appellee was suffering from retrograde amnesia, which had been caused by the injuries he sustained in the accident. Although he did testify, he was totally unable to give information concerning any events which took place on the day of the accident.

This circumstance prompted the court to instruct the jury:

"If you find that the Plaintiff in this case, as a result of the accident in question, suffered a loss of memory so as to be unable to testify as to his conduct at the time of and immediately preceding the accident here in question, then I instruct you that the law presumes the Plaintiff, in his conduct at the time of and immediately preceding the accident was exercising ordinary care.

"This presumption is a form of evidence. It will support a finding in accord with the presumption where there is no proof to the contrary; and it will support such a finding in the face of contrary evidence if your judgment so directs after weighing the conflicting evidence.

"When such a conflict exists, it is the jury's duty to weigh the presumption against the contrary evidence and to determine which, if either, preponderates. Such deliberations, of course, shall be related to and be in accordance with my instructions on the burden of proof."

■ Appellants concede that there is, in North Dakota, a rebuttable presumption (hereinafter referred to as the presumption of ordinary care) that one,

---

4. This issue was submitted as follows:
   "One of the issues in this case is whether the Plaintiff assumed the risk of the alleged hazards involved in bridge construction, employing construction methods as used in this case, and which conduct Plaintiff alleges caused the harm of which he here complains. If plaintiff assumed such risk, he may not recover for any such harm suffered by him.
   "In order for Plaintiff to have assumed such risk, he must have had actual knowledge of the particular danger and an appreciation of the risk involved and the magnitude thereof and must thereafter have voluntarily assumed such risk, or

the plaintiff, in the exercise of ordinary care, should have known of such danger and appreciated, or should, in the exercise of ordinary care, have appreciated the risk of injury therefrom and must have thereafter voluntarily assumed such risk."

5. There is authority for confining the doctrine to cases relating to master and servant, or to cases involving a contract relationship. However, it seems to be generally recognized that the defense of assumed risk may exist independently of the relation of master and servant. See 38 Am.Jur., Negligence, § 171; 65 C.J.S., Negligence, § 174.

who has suffered *death* by accident, was, at the time of the injury, in the exercise of due care for his own safety. Kunkel v. Minneapolis, St. P. & S. S. M. Ry. Co., 18 N.D. 367, 121 N.W. 830, 835 (1909); Quam v. Wengert, 86 N.W.2d 741, 751 (N.D.1957); Serbousek v. Stockman Motors, Inc., 106 N.W.2d 879, 887 (N.D.1961).

However, appellants claim that this rebuttable presumption has not been, and cannot be, extended in North Dakota to operate in favor of a person who has a loss of memory, resulting from the accident, so that he cannot testify to his conduct prior to, and at the time of, the accident.

Appellee concedes that the presumption of ordinary care has never been extended in North Dakota to benefit a party suffering from retrograde amnesia.

However, many jurisdictions have extended the presumption, which originally redounded only to persons killed, to include in its application persons injured in accidents whose resultant loss of memory, or insanity, prevents them from being capable of testifying about the accident. See 141 A.L.R. 872; IX Wigmore, Evidence, §§ 2507, 2510 (1964 Supp. to 3rd Ed.). See also, Scott v. Sheedy, 39 Cal.App.2d 96, 102 P.2d 575, 578 (1940); Prewitt v. Rutherford, 238 Iowa 1321, 30 N.W.2d 141, 144 (1947); Breker v. Rosema, 301 Mich. 685, 4 N.W. 2d 57, 141 A.L.R. 867 (1942); Torantolla v. Kansas City Rys. Co., 226 S.W. 617, 619 (Mo.App.1920); Koock v. Goodnight, 71 S.W.2d 927, 932 (Tex.Civ.App.1934).

In their brief, appellants point out that the application of the presumption to an injured party suffering loss of memory was recently rejected by the Minnesota Supreme Court. Dickson v. Bober, 269 Minn. 334, 130 N.W.2d 526, 532 (1964). That case is inapposite. Minnesota, unlike North Dakota, has a *statute* which specifically provides for the application of the presumption in the case of *death* of the party. Immediately after setting out the Minnesota statute, the Court stated:

"Although there is authority from other jurisdictions giving support to the proposition that a plaintiff deprived of his ability to testify by injuries received in an accident should be afforded the benefit of the presumption of due care, no such principle has ever been accepted in this state. In our judgment, the *trial court did not err in failing to instruct the jury that such a presumption was to be applied under the facts of this case.*" (Emphasis supplied). Id., at 532.

There is no rational reason why the presumption should not be extended to cover situations in which injury causes loss of memory; in fact, logic supports such an extension, since a person without memory of an accident can supply no more information about the circumstances of the accident than can a person who was killed.

We believe that Judge Register properly determined that the North Dakota Supreme Court would extend the presumption of ordinary care to a party incapable of testifying because of amnesia.

Appellants also claim that the presumption "disappears", and cannot be submitted to the jury, if "there is an eyewitness to the accident and there is testimony concerning the decedent's activities immediately preceding and at the time of the accident." Appellants then state:

"No less than five members of the crew working under the plaintiff's direction testified concerning the plaintiff's activities from the time they started work in the morning until the accident occurred. All of these witnesses had ample time and opportunity and did observe all the events and, specifically, the plaintiff's conduct during the time leading up to and at the very moment of the collapse of the bridge and the plaintiff's injury."

It seems to be the rule in North Dakota that the presumption "disappears" if there is an eyewitness who can fully testify to the facts which would otherwise be presumed. " 'Where there is an eyewitness to an accident, issue of due care rests upon proof, not upon presumption, and this is so even if eyewitness is the adverse party.' Foote v. Huelster, 272 Mich. 194, 261 N.W. 296, 298." Hausken v. Coman, 66 N.D. 633, 268 N.W. 430, 436–437 (1936). However, the mere fact that an eyewitness was present is not enough to annul the presumption. The eyewitness must have had sufficient time to observe whether the injured or deceased person was exercising due care in the crucial seconds before, and during, the accident. Quam v. Wengert, supra, 86 N.W.2d at 751–752, and cases there cited.

We have determined, supra, that the evidence supports a finding that the east beam splice failed because of some negligent movement of appellants' crane. In view of this permissible finding of negligence, the important question the jury was also required to resolve was whether the appellee was in the exercise of ordinary care for his own safety in the few seconds just prior to, and during, the actual breaking of the splice. We have carefully scrutinized the record, but have been unable to find even one eyewitness to appellee's conduct during those important moments. Therefore, the appellee was entitled to have the jury instructed on the presumption. See Cameron v. Great Northern Ry. Co., 8 N.D. 124, 77 N.W. 1016 (1898); Rober v. Northern Pac. Ry. Co., 25 N.D. 394, 142 N.W. 22 (1913); Smith v. Knutson, supra.

Appellants also complain because, under the instruction, the jury was permitted to consider the presumption as evidence. The question *whether* to instruct on presumptions and, if so, *how* to instruct on them has long been a troublesome one, regarding which the courts in the various states are not in unanimity. For more detailed discussion of the problem, see *McCormick, On Evidence*, §§ 314, 315, 316, 317 (1954). It is well settled in North Dakota that, in the absence of an eyewitness, the presumption of ordinary care is properly submitted to the jury. However, the cases do not clearly delineate whether the presumption is submissible to the jury as "evidence". See Cameron v. Great Northern Ry. Co., supra; Rober v. Northern Pac. Ry. Co., supra; Smith v. Knutson, supra; Quam v. Wengert, supra. It is the function of federal courts to interpret and apply, rather than to formulate and establish, state law. In diversity cases where, as here, the highest state tribunal has not definitely decided a legal issue, we attempt to determine how that court would decide the matter. Keeping in mind the applicable standards for review, we are of the opinion that Judge Register permissibly concluded that the North Dakota courts would submit the presumption as a form of evidence. Furthermore, in the absence of any eyewitnesses to appellee's conduct at the crucial time, we fail to perceive how prejudicial error could have resulted from the submission of the instruction.

As we stated, supra, the case was tried, and submitted to the jury, on the theory that appellant, Schultz & Lindsay, was vicariously liable for the negligence of Industrial because of the danger inherent in the construction of the bridge. Schultz & Lindsay contend that the "inherent danger" doctrine has no application and that the court erred: in admitting evidence bearing thereon; in submitting the issue to the jury and; in failing to grant its motion for directed verdict and motion for judgment n. o. v.

It is a fundamental principle of law, requiring no citation of authority, that an employer or contractee is not liable for the torts of an independent contractor. The subject, in all of its aspects, is discussed at 27 Am.Jur., Independent Contractors, § 27. However, the rule is not absolute. It affords no protection to the contractee for injuries caused by the failure of an independent contractor to exercise due care in the performance of work which is inherently or

intrinsically dangerous. Restatement, Torts, 2d Ed. § 427; 27 Am.Jur., Independent Contractors, § 39. North Dakota recognized and applied the inherent danger doctrine in the early case of Ruehl v. Lidgerwood Rural Telephone Co., 23 N.D. 6, 135 N.W. 793, L.R.A.1918 C, 1063 (1912). The doctrine was also recognized in Taute v. J. I. Case Threshing Machine Co., 25 N.D. 102, 141 N.W. 134 (1913); and in the more recent case of Newman v. Sears, Roebuck & Co., 77 N.D. 466, 43 N.W.2d 411, 17 A.L. R.2d 694 (1950).

The question of what type of work is considered inherently dangerous is not always readily soluble. Our research indicates that courts have found no rule of universal application by which they may abstractly draw a line of classification. At least one court has said:

> " * * * Generally speaking, the proper test is whether danger 'inheres* in performance of the work, and important factors to be understood and considered are the contemplated conditions under which the work is to be done and the known circumstances attending it. It is not enough that it may possibly produce injury. Stated another way, intrinsic danger in an undertaking is one which inheres in the performance of the contract and results directly from the work to be done—not from the collateral negligence of the contractor. (27 Am.Jur., Independent Contractors, § 39, p. 518; 57 C.J.S. Master and Servant § 590, b.(1), p. 361, and the annotation at 23 A.L.R. 1084, 1095.)" Reilly v. Highman, 185 Kan. 537, 345 P.2d 652, 656 (1959).

In North Dakota, the question whether the undertaking is inherently dangerous is primarily a fact question for the jury to determine. Taute v. J. I. Case Threshing Machine Co., supra, 141 N.W. at 136. Judge Register submitted the issue by an instruction which properly included all the facets of the doctrine. The jury was told that " 'inherently or intrinsically dangerous' means that an element of danger exists in the performance of the contract resulting directly from the work to be done, and not from the negligence of the party actually performing the work; * * *." The construction of the bridge involved extremely heavy steel girders and the use of machines and men working at a height of 18 to 20 feet, to name only a few factors. A witness for appellee who had been a structural engineer for the North Dakota State Highway Department, stated unequivocally that the construction was inherently dangerous and hazardous.[6] We conclude that the evidence warranted submission of the issue to the jury.

Schultz & Lindsay further contend that the doctrine is not applicable because appellee was not in the category of persons who are entitled to recover from a contractee, such as Schultz & Lindsay. Specifically, it is argued that only a "third person" is entitled to invoke the "inherent danger" doctrine, and that appellee is not a "third person". Cited as authority for this proposition are: Sword, Houston Fire & Cas. Ins. Co. v. Gulf Oil Corp., 251 F.2d 829 (5 Cir. 1958); Kelly v. Ford Motor Co., 104 Ohio App. 185, 139 N.E.2d 99 (1957); Cagle v. McQueen, 200 F.2d 186 (5 Cir. 1952); Hurst, Employers Cas. Co. v. Gulf Oil Corp., 251 F.2d 836 (5 Cir. 1958); Salmon v. Kansas City, 241 Mo. 14, 145 S.W. 16, 39 L.R.A.,N.S., 328 (1912). These cases are factually distinguishable and not controlling. We do not believe that the rule of exclusion, for which these cases stand, should be extended to the point where only a person wholly disassociated with an inherently dangerous project will be entitled to invoke the doctrine. See Person v. Cauldwell-Wingate Co., 176 F.2d 237 (2

---

6. This witness stated: "In bridge construction of this nature, steel erection, you're working with equipment men and steel, of course, and height, and when you get height in a factor of equipment and men, along with the weight from the steel, I feel it is hazardous and dangerous."

Cir. 1949), cert. denied, 338 U.S. 886, 70 S.Ct. 189, 94 L.Ed. 544 (1949); Blair v. Durham, 134 F.2d 729 (6 Cir. 1943); Fegles Construction Co. v. McLaughlin Construction Co., 205 F.2d 637 (9 Cir. 1953).

We have carefully examined the record in light of the contentions of appellants and the controlling law. The conclusion is inescapable that all questions presented on appeal had been properly ruled upon by the district court. The parties received a fair trial, and the judgment must be, and is, in all respects, affirmed.